ROBERT P. WHIPPLE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Whipple v. Commissioner
Docket No. 13713-79.
United States Tax Court
T.C. Memo 1981-213; 1981 Tax Ct. Memo LEXIS 529; 41 T.C.M. (CCH) 1399; T.C.M. (RIA) 81213; April 29, 1981. Robert P. Whipple, pro se. Thomas J. Stalzer, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: On October 23, 1978, respondent made a termination assessment of income tax under section 6851 in the amount of $ 20,678.26 for the taxable period January 1, 1978 through October 18, 1978. On May 4, 1979, petitioner *530 filed his income tax return for the year 1978. Respondent subsequently determined a deficiency in petitioner's 1978 income tax of $ 20,029.69 and an addition to tax under section 6651(a)(1) of $ 1,019.71. The issues for our decision are: (1) Whether respondent erred in computing the amount of the petitioner's tax liability for the taxable year ending December 31, 1978, and (2) Whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return without reasonable cause. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Robert P. Whipple (hereinafter petitioner) is an individual whose residence at the time of filing his petition was the Ohio Penitentiary, Columbus, Ohio. He filed his income tax return for the year 1978 on May 4, 1979. Petitioner graduated from high school some time in 1966. Prior to graduation from high school, he worked at various jobs such as a summer clerk in a grocery store, a caddy, and a carpenter. He was employed as early as 1964 and filed income tax returns as early as 1966. *531 Petitioner was the first in his family, and the first in his father's family, to graduate from high school. Moved by a combination of pride in his son, hope for his son's future, and the atmosphere of the draft, petitioner's father gave him some $ 8,000 to be used for a college fund. Petitioner, however, did not attend college but enrolled in a technical school. After his graduation from high school, petitioner continued to live with his parents. That summer he began working as a machine operator at Sun Rubber and was earning a salary he considered "substantial * * * for a guy [his] age," perhaps "$ 300 per week." He continued to work for Sun Rubber, with limited interruptions, until the fall of 1968, at which time he became a tool and die apprentice with LBL Mold & Die (hereinafter LBL). In 1969 petitioner was a mold design apprentice with LBL at an apprentice's wage of over $ 3 per hour. At the end of 1969 he left LBL and began working at Key State Mold & Die (hereinafter Key State), where he earned well over $ 4 per hour. Although petitioner could not recall the exact amounts of his yearly wages for 1966-1969, [1] he conceded that for the years 1966 and 1968, they *532 were less than $ 10,000 annually. In January of 1970, petitioner married his first wife, Nancy, and moved out of his parents' home. He continued working at Key State and on their 1971 joint return, petitioner and Nancy reported wages of $ 7,645.25 [2] and back interest of $ 38.47. During 1971, he paid for rent, utilities, food, medical expenses, entertainment, transportation, and clothes. In June of 1972, petitioner divorced Nancy. Because he was laid off for part of the year, he reported wages of only $ 3,211.22 for 1972 but did receive unemployment compensation benefits. The expenses associated with the divorce, $ 300, were not paid until 1977 because he felt he could not pay them until that time. Nancy did not receive, or ask for, any cash in the way of property settlement. Sometime during 1972, petitioner temporarily moved back into his parents' home and during the time he lived with his parents, he did not pay rent or share in expenses such as food. Petitioner filed a return as head of household for 1973 and reported *533 wages of $ 4,550.10. For 1974 he reported wages of $ 14,089.95 and interest income from a bank of $ 37.81. Again he filed as "head of household", and claimed as dependents his brother and two sisters. For 1975 petitioner reported wages of $ 4,861.28 and bank interest of $ 197.52; he filed as a "head of household" but claimed only his brother as a dependent. The drop in wages was due to his being laid off after the first quarter of the year. Petitioner again received unemployment compensation but paid for rent, utilities, food, and transportation and in addition furnished his brother certain unspecified amounts. From the summer of 1975 to the summer of 1976, George Mitchen lived with petitioner and the two split all living expenses "down the middle." There is some indication that other, prior to or after Mr. Mitchen, may have lived or temporarily stayed with petitioner and shared some of the household expenses; however, no years or amounts are specified. Petitioner was unemployed throughout most of 1976. He continued to receive unemployment compensation and reported wages of only $ 106.52 and bank interest of $ 165.08 for that year. Petitioner married his second wife, *534 Kathleen, in 1977 and they had a child, Jennifer, in 1978. In their 1977 joint return, wages of $ 3,668.25 and bank interest of $ 203.49 were reported. Petitioner, in 1977, paid for rent, food, clothes, and utilities. At the time of trial, he and Kathleen were in the process of being divorced. During periods of unemployment petitioner received food stamps. He also testified that he sometimes received addtional funds because of a prudent automobile purchase followed by a sale or an insurance claim. On October 16, 1978, one Michael Ferguson (hereinafter Ferguson) was arrested by law enforcement officials of Wayne County, Ohio. At the time of his arrest, Ferguson was using a car which belonged to petitioner and was found to be in possession of 50 pounds of marijuana. On October 18, while in custody, Ferguson overheard the Wayne County Sheriff speak of a planned raid on petitioner's home, and Ferguson used his bond call to telephone petitioner and warn him of the imminent raid. On the same day, Sheriff's officers of Wayne County and the Med-Way Enforcement Group, a local undercover narcotics agency, intercepted petitioner while he was driving his car and arrested him. A search *535 yielded $ 13,250 in cash in petitioner's right jacket pocket, $ 4,020 in cash in his left jacket pocket, $ 5,000 in cash in a right boot found in the car, $ 15,100 in a left boot found in the car, and $ 806.46 in cash on his person, a total of $ 38,176.46. No weapons or drugs, with the exception of two marijuana cigarette butts, were discovered by the authorities. Having been forewarned of the raid, petitioner, when arrested, was en route from his home to the bank to place the $ 38,176.46 in a safety deposit box. He claimed he had nothing illegal in his home and just thought it would be prudent to put the cash in a bank prior to the raid. On or about October 19, 1978, petitioner, as owner of the car used by Ferguson, was indicted for violation of Ohio Rev. Code Ann. sec. 2925.13 (Anderson Supp. 1980) which provides that "[n]o person, being the owner, operator * * * shall knowingly permit such vehicle to be used for commission of a felony drug abuse offense". [3] On or about March 28, 1979, the prosecutor's office of Wayne County obtained leave to amend the indictment and subsequently the indictment was amended to allege violation of Ohio Rev. Code Ann. sec. 2925.03(A)(6) *536 (Anderson Supp. 1980), a Trafficking Offense, which provides in pertinent part that "[n]o person shall knowingly * * * [p]ossess a controlled substance in an amount equal to or exceeding three times the bulk amount * * *". Petitioner has at all times maintained that he never possessed any marijuana. On March 28, 1979, he pleaded no contest to the amended indictment, and on June 14, 1979, was sentenced to be imprisoned for a period of not less than 1 nor more than 10 years. Petitioner subsequently challenged the validity of the no contest plea, [4] still as always maintaining his innocence. At the time of this trial, his case was pending before the Supreme Court of Ohio. *537 For 1978 petitioner reported income from a mold design business, $ 4,500, and interest from a bank account, $ 286.12. He received no gifts or inheritance during the taxable year 1978. In the notice of deficiency, respondent recalculated petitioner's 1978 adjusted gross income by computing increase in net worth and determined that petitioner had the following living expenses in 1978: Clothing
$ 100.00
Rent
1,880.00
Electric
435.00
Phone
240.00
Oil
125.00
Food
1,625.00
Auto expense
600.00
Medical
100.00
Gifts
200.00
Meals out of home
150.00
Recreation
200.00
Vacation -- Germany
1,322.00
Legal fees
2,000.00
Washer and dryer
500.00
Stove
120.00
Subscription - National
Geographic
12.00
Bond premium and fees
2,055.00
Total
$ 11,664.00
The parties have stipulated to the above amounts except rent, vacation - Germany, and washer and dryer; however, petitioner has not offered any alternative figures as to these items nor has he objected to them on brief. Respondent determined petitioner's increase in net worth and adjusted gross income as follows: ASSETS
1-1-78
12-31-78
Cash on hand
0
$ 900.00
Cash in First National Bank Safety
deposit box
0
0
Cash in possession of Wayne County
Sheriff
0
38,176.46
Loan to Ron Petty in Small Claims Court
0
250.00
50 1bs. of marijuana consigned to
Ferguson but in possession of Sheriff
0
1,500.00
Banc Ohio - Akron National Bank
$ 171.14
0
Banc Ohio - Akron National Bank [5]
4,962.30
1.00
1975 Vega in possession of Sheriff
1,600.00
1,600.00
1950 GMC Pickup
450.00
450.00
1972 Honda
300.00
300.00
1972 Nova
0
900.00
1972 Gremlin (including valve job)
0
500.00
Total Assets
$ 7,483.44
$ 44,577.46
LIABILITIES:
0
0
Net Worth
$ 7,483.44
$ 44,577.46
Less: Net worth at beginning of year
7,483.44
Increase in net worth
$ 37,094.02
Add: Personal living expenses
11,664.00
$ 48,758.02
Less: Non-taxable receipts - 1977 Federal
tax refund
782.20
Adjusted gross income as corrected
$ 47,975.82
Adjusted gross income as reported
4,786.12
Understatement of adjusted gross income
$ 43,189.70
*538 The parties by their stipulation have agreed to most of these amounts. As to many of those amounts not stipulated, petitioner again has neither offered alternative amounts nor has he objected to them on brief. He does contend, however, that the cash discovered by the authorities and later put in possession of the Wayne County Sheriff, $ 38,176.46, was the accumulation of his life savings and not unreported taxable income. Furthermore, he contends that the inclusion in his closing net worth of the value of the 50 pounds of marijuana discovered in the possession of Ferguson was erroneous. Respondent maintains that the $ 38,176.46 was received by petitioner from the sale of marijuana and perhaps other illegal substances. Respondent also determined that the 50 pounds of marijuana belonged to petitioner and was merely "consigned" to Ferguson. ULTIMATE FINDINGS OF FACT 1. With the exception of the inclusion of the value of 50 pounds of marijuana as an asset of petitioner, respondent has correctly calculated petitioner's increase in net worth and *539 adjusted gross income for 1978. 2. Petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return without reasonable cause. OPINION Issue 1 - Omission of Income. Respondent determined a deficiency in petitioner's Federal income tax for 1978 employing the net worth method of calculation. Petitioner does not contest respondent's right to use the net worth method as evidence of unreported income, see Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955), but in the most general terms, challenges the accuracy of portions of respondent's calculation. See Holland v. United States, 348 U.S. 121 (1954). Petitioner's attack on respondent's determination is on two fronts, first, that the $ 38,176.46 found by the authorities represents the accumulation of his life savings and not unreported taxable income, and should therefore be included in his opening net worth, and second, that the value of the 50 pounds of marijuana found in the possession of Ferguson should be excluded from his closing net worth since he was not its owner. It is well established that *540 the burden is upon petitioner to show that the deficiency as determined by respondent was erroneous Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
A. Cash Hoard. Petitioner claims that since 1964 he has worked hard, that he has always been extremely frugal, and that he has always been able to save and accumulate. He claims that he never trusted banks but only used them to expedite certain necessary transactions. He maintains that even though he moved to new homes or back to the home of his parents, he always kept the money in secret hiding places. His second wife, Kathleen, who at the time of trial was in the process of being divorced from petitioner, testified that she knew he kept money hidden in their home; however, she could only recall seeing wrapped packets of bills, one, she assumed, amounting to $ 2,000. Throughout the trial petitioner was repeatedly asked how much of the $ 38,176.46 was traceable to a specific year. Most of his responses were mere estimates and often he could not even hazard a guess. He did testify that he was able to save $ 12,000 (including the $ 8,000 college fund) by *541 the time he graduated from high school in 1966, a few hundred from one job and a few thousand from another job in 1968, about $ 4,000 in 1969, saved some amount in 1972, $ 7,000-$ 8,000 in 1974, $ 0 in 1976, and a small amount, if any, in 1977. After careful examination of the entire record we conclude that petitioner's explanation of his cash hoard is not sufficiently credible to sustain his burden.Petitioner contends that he hoarded the money because he distrusted banks, yet throughout the years he has maintained bank accounts. His ostensible reason, that he needed the accounts only to expedite transactions, may justify the need for checking accounts but does not adequately explain his savings accounts. For the years 1975, 1976, 1977, and 1978 he reported bank interest in the amounts of $ 197.52, $ 165.08, $ 203.49, and $ 286.12, respectively. As of December 31, 1977, he had $ 4,962.30, [6] and as of October 1, 1978, $ 7,700 in a savings account. These amounts are inconsistent with his professed distrust of banks. [7] Moreover, petitioner when arrested was en route from his home to the bank because he felt that a bank would be the best place for the $ 38,176.46 he was carrying. *542 Even if we accepted at face value petitioner's distrust of banks and his account of the cash hoard, our analysis of his earnings and expenses from 1966-1978 refutes his claim that the cash hoard remained essentially intact. Petitioner testified that he saved nothing in 1976 and little, if any, in 1977. Thus, he must prove that he possessed the funds at the end of 1975. Although petitioner may be frugal or, in his own words, a "cheapskate", we are unconvinced that his income over the years could support the accumulation of $ 38,176.46 in cash in addition to the opening net worth determined by respondent. Much of this cash, petitioner contends, was hoarded in the early years, yet in the lean years, the years of unemployment, food stamps, and support of dependents, petitioner would have us believe he never dipped into his hidden nest egg. Thus, in 1976 petitioner reported adjusted gross income of only *543 $ 271.60 yet he contends that during this period the cash hoard remained intact. And during the years 1971-1977 his largest reported adjusted gross income was $ 14,127.76 and the next largest was $ 7,683.72. These figures reflect only adjusted gross income and do not take into account any taxes paid thereon. Even if it be assumed that petitioner lived at home for periods, that he sometimes shared household expenses, that he received additional funds due to automobile investments, and that he received unemployment compensation benefits and food stamps, his normal living expenses coupled with the rate of inflation had to diminish substantially his hidden savings, if any, from earlier years.Petitioner as of January 1, 1978, had cash in bank accounts totalling $ 5,133.44 and three cars valued at cost, amounting to $ 2,350.00. After careful examination of the facts and figures in the record, we find that petitioner's disposable income throughout the years could not have enabled him to amass the amount of cash he claims. We further find that any amount his frugality enabled him to save is properly reflected in the opening net worth determined by respondent. Our credulity will not *544 stretch so far as to accept the existence of a hidden cash hoard of accumulated savings as of December 31, 1977, and since petitioner has offered no further evidence to explain the increase in his net worth, [8] we need not decide whether the likely source of that increase was the sale of marijuana inasmuch as all sources of nontaxable income have been negatived. [9]United States v. Massei, 355 U.S. 595 (1958); Kramer v. Commissioner, 389 F.2d 236 (7th Cir. 1968) affg. a Memorandum Opinion of this Court; United States v. Costanzo, 581 F.2d 28 (2d Cir. 1978), cert. denied 439 U.S. 1067 (1979). B.Closing Net Worth - 50 pounds of marijuana. Respondent determined that the 50 pounds of marijuana found in possession of Ferguson was an asset of petitioner. Petitioner denies ownership and therefore contends that the value of the marijuana should not be included in determining the increase in his net worth. On this point, *545 we agree with petitioner. Respondent points to petitioner's plea of no contest to the charge of possession of an amount equal to or exceeding three times the bulk amount of a controlled substance. Three times the bulk amount under Ohio law is only 600 grams (about 1.32 pounds). See Ohio Rev. Code Ann. sec. 2925.01(E)(3) (Anderson Supp. 1980). Furthermore, the offense charged is one of possession which does not necessarily connote ownership. [10] See Ohio Rev. Code Ann. sec. 2925.03(A)(6) (Anderson Supp. 1980). Thus, we find it difficult to support the inclusion of the value of 50 pounds of marijuana as an asset owned by petitioner [11] on the basis of a no contest plea to the charge of possession. *546 Respondent also asks us to consider testimony that Ferguson told an agent that petitioner was the true owner of the marijuana. Ferguson did not testify, nor did the agent who allegedly heard Ferguson's accusation. We are prepared to believe that it would be in Ferguson's best interest to deny drug ownership; we would in fact be astonished if Ferguson were to assert a claim of ownership of drugs to an agent of the Internal Revenue Service.But in any event, testimony of one agent that another agent heard Ferguson once say petitioner was the true owner of the 50 pounds of marijuana is sheer hearsay and of no probative value. While we recognize that the ownership of 50 pounds of marijuana is not easily determined by normal methods of inquiry, we note that petitioner has adamantly denied ownership of the marijuana even though he has either stipulated or failed to deny most of the other figures in respondent's determination. In view of the fact that Ferguson was in possession of the marijuana when it was confiscated by the authorities, and that respondent has offered no credible evidence supporting his contention that the marijuana was "consigned" to Ferguson, we find that petitioner *547 was not the owner of the 50 pounds of marijuana and it was erroneous for respondent to include its value in determining petitioner's closing net worth. Petitioner has sustained his burden as to ownership of the 50 pounds of marijuana. Issue 2 - Addition to tax under section 6651(a)(1). Section 6651(a)(1) generally provides for the imposition of an addition to tax for failure to file a timely return unless "such failure is due to reasonable cause and not due to willful neglect." [12] Petitioner's return was due April 15, 1979. The return was filed May 4, 1979. *548 Petitioner offered no evidence as to why the return was delinquent and did not even address the issue on brief. The burden of establishing reasonable cause and that respondent's determination is thus erroneous is upon petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Bebb v. Commissioner, 36 T.C. 170, 173 (1961). Petitioner has failed to sustain his burden of proof as to this issue; accordingly, respondent's determination as to the addition to tax under section 6651(a)(1) is sustained. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner filed income tax returns for those years but apparently they are not now available.↩
2. There is no testimony as to wages for 1970.↩
3. Sec. 2925.13 [Permitting drug abuse.] (A) No person, being the owner, operator, or person in charge of a locomotive, watercraft, aircraft, or other vehicles as defined in division (A) of sec. 4501.01 of the Revised Code, shall knowingly permit such vehicle to be used for commission of a felony drug abuse offense. (B) No person, being the owner, lessee, or occupant, or having custody, control, or supervision of premises, or real estate, including vacant land, shall knowingly permit premises, or real estate, including vacant land, to be used for commission of a felony drug abuse offense by another person. (C) Whoever violates this section is guilty of permitting drug abuse, a misdemeanor of the first degree, and if the offender has previously been convicted of a drug abuse offense, permitting drug abuse is a felony of the fourth degree. (D) Vehicles used in violation of division (A) of this section shall be seized and forfeited to the municipal corporation or county in which such violation occurred, upon motion to the common pleas court, except that if the violation occurs in a township and the offender is lawfully arrested by a law enforcement officer employed by the township, the court shall order the vehicle forfeited to the township. Forfeiture shall not apply to common carriers or innocent owners, nor shall they affect the rights of a holder of a valid lien. ↩
4. Petitioner testified that he is challenging the validity of the no contest plea because he was not informed as to what a no contest plea meant, was not informed as to what the "bulk amount of marijuana" amounted to, was not properly asked if he understood the charges, and was not asked if any deals were made to secure the no contest plea.↩
5. Petitioner testified that he had $ 7,700 in his savings account at Banc Ohio - Akron National Bank on October 1, 1978.↩
6. Petitioner on December 31, 1977, also had $ 171.14 in a checking account. ↩
7. We are in any event not persuaded on the present record that petitioner, from 1966 on, would forego the interest to be earned from savings accounts because of his unexplained fear of banks.↩
8. Petitioner received no gifts or inheritances during 1978. ↩
9. We note that we draw no inference from petitioner's plea of no contest that petitioner was involved in the sale of marijuana.↩
10. "Possess" or "possession" means having control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found. Ohio Rev. Code Ann. sec. 2925.01(L)↩ (Anderson Supp. 1980). 11. Because of the conclusion we have reached, we need not discuss Rules 410, 609(a), (e), Federal Rules of Evidence↩ with respect to the plea of no contest. Also see n. 7.
12. Sec. 6651(a)(1) provides: (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; * * *↩